UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>    Plaintiff,<br><br>    v.<br><br>TERRY O. COTTRELL,<br><br>    Defendant. | CAUSE NO. 3:19-CR-91 DRL |

OPINION & ORDER

The government charged Terry Cottrell with possessing child pornography. *See* 18 U.S.C. § 2252(a)(4)(B). Over the course of some revisionary briefing, Mr. Cottrell seeks to suppress his statements made in police custody after being advised of his *Miranda* rights. He says he never voluntarily, knowingly, and intelligently waived his rights under the Fifth Amendment. The court now denies the motion to suppress.

FACTUAL FINDINGS

The parties agree to the facts. On October 23, 2019, acting on a tip from the search engine Bing, law enforcement executed a search warrant at Joshua Cottrell's residence. Terry Cottrell, Joshua Cottrell's brother, also lived there. Officers interviewed both men.

Joshua Cottrell, who law enforcement concluded wasn't involved with child pornography, informed officers that his brother, who had been sleeping, suffered from schizophrenia and bipolar disorder and took medication for these conditions. He said his brother would not likely be comfortable talking to them. He explained his brother slept all day, would wake at 4:00 p.m., and then play games on his laptop until about 6:00 a.m. His brother was not employed.

Officers woke Terry Cottrell and allowed him to wait in the living room while they completed their search. Forensics at the house eventually revealed child pornography on his devices—both a

cellphone and laptop computer. Homeland Security Agent Robert Gallowitch and ISP Trooper Vicki Maxwell took Mr. Cottrell alone to an interview room in a mobile police vehicle, donning an adult fuzzy bear onesie and holding cigarettes and a cup of coffee.

Agent Gallowitch made introductions. He told Mr. Cottrell that to have a conversation, the officers needed his permission [ECF 48-4 at 0:57]. Agent Gallowitch presented a written waiver of rights for Mr. Cottrell to sign [*Id.* 1:00]. Agent Gallowitch informed Mr. Cottrell that he did not have to say anything. He could decide whether to respond to questions [*Id.* 1:00-1:10]. After confirming Mr. Cottrell could read English, Agent Gallowitch explained the waiver of rights form, and said Mr. Cottrell was not under arrest but that "we have to do this so that you feel safe" [*Id.* 1:15-1:19]. Agent Gallowitch told him he could remain silent and that he could have an attorney with him before he answered questions [*Id.* 1:30-1:48]. He could then choose to answer certain questions but not others because Mr. Cottrell "had control over this" [*Id.*].

Agent Gallowitch instructed Mr. Cottrell to read the form, and then said, "if you are at least willing to listen to what we have to say, print your name and sign it here, okay? Then we'll explain everything we're going to do." [*Id.* 1:40-1:57]. As Mr. Cottrell reached for the form, Agent Gallowitch informed Mr. Cottrell that his brother signed the form [*Id.* 2:10]. Trooper Maxwell showed him Josh Cottrell's signed form. Agent Gallowitch then calmly underscored that just because his brother signed the form didn't mean that Mr. Cottrell had to sign it [*Id.* 2:25]. Mr. Cottrell then reviewed the form, printed his name, and informed Agent Gallowitch and Trooper Maxwell that he didn't have a signature [*Id.* 2:30-3:18]. The officers said that he could sign with anything [*Id.*].

Over the next approximate two hours and twenty minutes, Mr. Cottrell confessed to the possession of illicit images. He was not arrested but taken instead to a mental health facility where he had a prior appointment that day. Mr. Cottrell contests the voluntariness, knowingness, and

2

intelligence of his waiver, arguing that he was coerced by officers who knew he suffered from schizophrenia and bipolar disorder and who knew he relied on his brother as his caregiver.

DISCUSSION

The Fifth Amendment to the United States Constitution prohibits the use of an involuntary incriminating statement against a defendant in a federal criminal trial. *Dickerson v. United States*, 530 U.S. 428, 433 (2000). The Fifth Amendment commands that no person "shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V. Under *Miranda v. Arizona*, 384 U.S. 436, 444 (1966), the government must show that the defendant waived his rights before a custodial interrogation, else his statements must be excluded. *See, e.g., United States v. Podhorn*, 549 F.3d 552, 557 (7th Cir. 2008).

The law safeguards the privilege against self-incrimination by requiring specific warnings, or other fully effective means of protection, for persons who undergo custodial interrogations. *See Miranda*, 384 U.S. at 478-79. Generally, "the prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination." *Id.* at 444. These procedural safeguards—often "*Miranda* warnings"—are not implicated in every instance of police questioning. *See United States v. Patterson*, 826 F.3d 450, 454 (7th Cir. 2016) (quoting *Oregon v. Mathiason*, 429 U.S. 492, 495 (1977)). "To implicate *Miranda*, the suspect must be in custody, and the suspect must be subjected to interrogation." *Id.* (citing *Miranda*, 384 U.S. at 444, 445 & 457).

For a defendant to have validly waived his rights under *Miranda*, two facts must be true. First, the defendant must have waived his rights "voluntarily." *Miranda*, 384 U.S. at 444. In other words, the waiver must have been "the product of a free and deliberate choice rather than intimidation, coercion, or deception." *Moran v. Burbine*, 475 U.S. 412, 421 (1986); *accord Colorado v. Spring*, 479 U.S. 564, 573-74 (1987). Second, the defendant must have waived his rights "knowingly and intelligently." *Miranda*,

384 U.S. at 444. The "totality of the circumstances surrounding the interrogation" must show that the defendant had "a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." *Moran*, 475 U.S. at 421; *Spring*, 479 U.S. at 574; *see, e.g., Collins v. Gaetz*, 612 F.3d 574, 586-87 (7th Cir. 2010).

      A.     *Mr. Cottrell Was in Police Custody at the Time of His Waiver and Questioning.*

The government first argues that officers weren't required to advise Mr. Cottrell of his rights because he wasn't in custody. "*Miranda* safeguards come into play whenever a person in custody is subjected to either express questioning or its functional equivalent." *Rhode Island v. Innis*, 446 U.S. 291, 300-301 (1980); *accord Mathiason*, 429 U.S. at 494. A person must be both in custody and interrogated to trigger the need for *Miranda* warnings. *See Illinois v. Perkins*, 496 U.S. 292, 297 (1990). *Miranda* warnings prophylactically exist to protect the constitutional right against self-incrimination under the Fifth Amendment precisely because the "inherently coercive nature of custodial interrogation [can] blur the line between voluntary and involuntary statements." *United States v. Ambrose*, 668 F.3d 943, 954 (7th Cir. 2012).

Custodial interrogation means "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." *Miranda*, 384 U.S. at 444. A person is in custody not just when he is under arrest but when objectively his freedom of movement is restrained to a degree comparable to a formal arrest. *United States v. Salyers*, 160 F.3d 1152, 1159 (7th Cir. 1998). A person is not in custody if a reasonable person would have believed he was free to leave. *Id.* The court assesses whether a reasonable person would feel free to leave by looking to see "whether the encounter occurred in a public place; whether the suspect consented to speak with the officers; whether the officers informed the individual that he was not under arrest and was free to leave; whether the individual was moved to another area; whether there was a threatening presence of several officers and a display of weapons or physical force; and

whether the officers' tone of voice was such that their requests were likely to be obeyed." *United States v. Snodgrass*, 635 F.3d 324, 327 (7th Cir. 2011) (citation omitted).

Law enforcement first interacted with Mr. Cottrell in the home, making the move to its secure mobile police unit (a converted recreational vehicle) all the more significant. Mr. Cottrell was permitted to retrieve warmer clothes (his fuzzy bear suit) and cigarettes, but only accompanied by an officer. He was likewise "escorted" to the mobile unit. He wasn't handcuffed or restrained, and even held a coffee mug, but one officer appeared to secure and lock the mobile unit's door behind her. He was seated near the door, but not closer than one officer. Two officers sat with him in a rather confined space, lending to no reasonable impression that he could simply walk out. He was advised he wasn't under arrest, but not advised that he was free to leave. There was no display of force, though both officers were armed. The officers addressed Mr. Cottrell with courtesy. They never acted intimidating. That said, officers conditioned their conversation on Mr. Cottrell signing a waiver of rights. The waiver included space to enter the time of custody as a predicate for the time the waiver was signed. And the interview lasted over two hours.[1] On this record, a reasonable person would believe he wasn't free to leave, so Mr. Cottrell was in custody and entitled to be advised of his *Miranda* rights.

      B.     *Mr. Cottrell's Waiver of Rights Was Voluntary.*

To determine if a defendant acted voluntarily, the court looks to "the totality of all the surrounding circumstances—both the characteristics of the accused and the details of the interrogation." *Schneckloth v. Bustamonte*, 412 U.S. 218, 226 (1973). Factors may include the defendant's age, *see Haley v. Ohio,* 332 U.S. 596, 599 (1948); mental health, *see Blackburn v. Alabama*, 361 U.S. 199, 211 (1960); education, *see Payne v. Arkansas*, 356 U.S. 560, 568 (1958); intelligence, *see Fikes v. Alabama*, 352 U.S. 191, 197-98 (1957); time under interrogation, *see Davis v. North Carolina*, 384 U.S. 737, 752

---

[1] Trooper Vicki Maxwell states in her affidavit that the interview lasted about an hour and a half, but the video records just over two hours and twenty minutes before Mr. Cottrell exits the mobile unit.

5

(1966); and use of physical punishment or deprivation of food or sleep, *see Reck v. Pate*, 367 U.S. 433, 440-41 (1961), among others. His waiver must have been "the product of a free and deliberate choice rather than intimidation, coercion, or deception." *Moran*, 475 U.S. at 421.

*Miranda* protects a defendant against government coercion leading to the surrender of "rights protected by the Fifth Amendment," but "it goes no further than that." *Colorado v. Connelly*, 479 U.S. 157, 170 (1986). The sole concern is governmental coercion. "The voluntariness of a waiver of [Fifth Amendment rights] has always depended on the absence of police overreaching, not on 'free choice' in any broader sense of the word." *Id.* As "interrogators have turned to more subtle forms of psychological persuasion," federal courts have found a defendant's mental condition "a more significant factor," but not "by itself and apart from its relation to official coercion." *Id.*; *see, e.g., Blackburn*, 361 U.S. at 202-04, 211 (finding insane defendant's confession involuntary after eight or nine hours of interrogation in a tiny room filled with police officers, without relatives or counsel, based on statements the sheriff drafted).

No coercion of constitutional concern occurred here. The officers treated Mr. Cottrell politely and respectfully. Rather than coerce him, they made him comfortable. They allowed him to get warm clothes, coffee, and cigarettes (and about an hour in offered him water). To be sure, in introducing the written waiver and knowing to a degree his mental health, they told Terry Cottrell that his brother, Josh Cottrell, had already signed the same form; but, in the very next breath, they underscored that "just because Josh did it doesn't mean you have to. You have control over this." *See Illinois*, 496 U.S. at 297 ("ploys to mislead a suspect or lull him into a false sense of security that do not rise to the level of compulsion or coercion to speak are not within *Miranda*'s concerns"). Terry Cottrell, who later in the interview would be critical of his brother's care, was not bereft of independent thinking.

Mr. Cottrell argues that law enforcement knew he was schizophrenic and bipolar, but nothing indicates that law enforcement coerced him or exploited his mental health in a way that suggests

6

unconstitutional overreaching. Looking at the totality of the circumstances, the court concludes that officers, though at times toeing the line of persuasiveness, avoided coercive techniques. Officers knew from the brother that Mr. Cottrell likely wouldn't feel comfortable talking to them, so they made him comfortable; but that isn't coercion. Though the room was small, there was space for Mr. Cottrell to move freely, and space on the table for him to rest his cigarettes and coffee. The room was warm, but Mr. Cottrell said he liked it warm because the house was cold (it was late October in Northern Indiana). At one point, when the officers indicated that they wanted to complete their investigation and get out of his hair, Mr. Cottrell said, "I want to stay here. It's warm." [ECF 48-4 at 15:23]. Mr. Cottrell, while seemingly nervous at the start, was friendly with the officers and even showed the officers the bear ears on his onesie [*Id.* 0:20, 3:35]. Officers returned the sentiment; Agent Gallowitch showed Mr. Cottrell his badge. At no time were any weapons displayed to Mr. Cottrell or was Mr. Cottrell physically restrained. The officers never raised their voice or even made demands; instead, their tone was careful and friendly, often overly so. Nothing demonstrates coercion in getting Mr. Cottrell to sign a waiver of rights.

Agent Gallowitch told Mr. Cottrell that, to have a conversation and "at least listen to what we have to say," he needed Mr. Cottrell's permission [*Id.* 0:57, 1:55]. He said the waiver was to make Mr. Cottrell feel safe. That could be interpreted more than one way, at least one way less than candid and bothersome, but Agent Gallowitch didn't stop there. He told Mr. Cottrell that he didn't have to answer any questions, could choose to answer some questions but choose not to answer others, and that he had the right to an attorney. He explained the form was a statement of Mr. Cottrell's rights. He encouraged Mr. Cottrell to read the waiver. Agent Gallowitch explained the rights included in the *Miranda* waiver, and confirmed that Mr. Cottrell could read English. Mr. Cottrell briefly read the waiver before he signed it, but not in any way that was rushed [*Id.* 2:30-3:18]. The waiver explained that the

agent must first advise him of his rights before he could begin asking questions and that Mr. Cottrell was knowingly and voluntarily waiving his rights [ECF 48-3].

Even beyond the circumstances surrounding his execution of the waiver of rights, a review of the interview in its entirety reveals that Mr. Cottrell acted voluntarily. He was interviewed by two officers for just shy of two-and-a-half hours—a thorough interview but not one that even nearly broached the point of coercive. Notwithstanding any mental health challenges at age 36, and the interview reveals some sense of these challenges, Mr. Cottrell spoke lucidly. He responded to questions freely and intelligently. He understood the nature of the justice system, his right to an attorney, and the consequences of his actions. He declined to give his computer password to officers [ECF 48-4 at 34:10], even earlier asking the officers why they wanted to know his password to his phone too [*Id.* 4:21]. He informed them of his past offenses for which he was adjudicated [*Id.* 37:20, 1:16:43, 1:17:30; 1:24:45]. He identified immediately one image of child pornography [*Id.* 27:07]. The officers claimed they would not judge, but he rebuffed that and acknowledged that they say that only for the sake of friendliness and to get what they need [*Id.* 35:00]. He later said the recording made him uncomfortable because he couldn't share "things" for fear that they would be used against him and then referenced his *Miranda* rights [*Id.* 1:22:54-1:23:10]. He repeated aloud, "anything you say can be used against you" [*Id.*]. In short, he knew when he didn't want to disclose something—a level of cognition that underscores his voluntariness when he did.

Mr. Cottrell cites *Brewer v. Williams*, 430 U.S. 387, 400 (1977), to argue that when a police officer knows of the mental predisposition of a defendant, but nonetheless uses that mental status to manipulate a defendant, the officer's actions are coercive. However, *Brewer* involved law enforcement's intentional movement of the defendant (a deeply religious man) from one facility to another, outside of the presence of the defendant's lawyer after he had asked for counsel, to drive past the location of the victim's remains and illicit a confession by stating the victim's family deserved a Christian burial.

*Id.* at 399-400. The court concluded that this act was a violation of the defendant's constitutional rights. *Id.* at 405. The circumstances here are distinguishable as Mr. Cottrell never invoked his right to counsel, though he appreciated that right.

Though the officers knew Mr. Cottrell was schizophrenic and bipolar, they were not informed until several minutes after Mr. Cottrell signed the waiver that Joshua Cottrell was considered by Terry Cottrell as "kind of like [his] caretaker" [ECF 48-4 at 6:55]. And though Mr. Cottrell acknowledged that he didn't leave the house often [*Id.* 8:50, 1:54:00], and he didn't like crowds or too much stimulation [*Id.* 1:09], he explained that he went on his own to mental health appointments [*Id.* 8:50]. He admitted to officers that he didn't share his current internet activity with his brother [ECF 48-4 at 02:00:29] and was concerned if his brother found out, he would "abandon" him and Mr. Cottrell would be left with nothing [*Id.* 2:00:06-2:00:29]. Mr. Cottrell wasn't blindly dependent on his brother; he instead critically thought about what he volunteered.

Based on the court's assessment of the circumstances surrounding the waiver and Mr. Cottrell's subsequent statements—the agent's recitation of rights, Mr. Cottrell's reading of his rights, the officer's continued reminders that Mr. Cottrell was in control and able to make his own decisions, and Mr. Cottrell's clear and detailed responses coupled with his occasional restatement of his rights—Mr. Cottrell voluntarily waived his *Miranda* rights. The waiver was not the product of coercion. *See Schneckloth*, 412 U.S. at 226.

    C.    *Mr. Cottrell's Waiver Was Knowing and Intelligent.*

A "waiver must have been made with a full awareness both of the nature of the right being abandoned and the consequences of the decision to abandon it." *Spring*, 479 U.S. at 573 (quoting *Moran*, 475 U.S. at 421). A defendant must waive his rights "knowingly and intelligently." *Miranda*, 384 U.S. at 444. The court again examines the totality of the circumstances. *See Spring*, 479 U.S. at 573; *Collins*, 612 F.3d at 587. Here, there is no doubt that Mr. Cottrell's waiver of his rights was knowingly

9

and intelligently made—that he understood he had the right to remain silent and that anything he said could be used as evidence against him. *See, e.g., Spring*, 479 U.S. at 574. "It is only when the evidence in the case shows that the defendant could not comprehend even the most basic concepts underlying the *Miranda* warnings that the courts have found an unintelligent waiver." *Collins*, 612 F.3d at 588.

Officers reviewed the form with Mr. Cottrell. He took the opportunity to review it too. The agent told Mr. Cottrell that he didn't have to answer any questions, could answer some questions but choose not to answer others, and that he had the right to an attorney. He explained the form was a statement of Mr. Cottrell's rights. Similar to findings from the competency hearing, on this day Mr. Cottrell understood the nature of the justice system, his right to an attorney, and the consequences of his actions. He refused giving certain information and offered other information. He said the recording made him uncomfortable because he couldn't share "things" for fear that they would be used against him [ECF 48-4 at 1:22:54-1:23:10]. Again, he said, "anything you say can be used against you" [*Id.*]. He understood his rights and the consequence of waiving them.

Of note, in addition to the other circumstances marshaled in this discussion already, right after Mr. Cottrell signed the waiver and before he said much in the way of substance, the officers shared upfront that they were investigating child pornography and that they had gotten a tip that led to the search warrant for the house. They weren't even tricky about this explanation. They disclosed why they were there. From there, Mr. Cottrell displayed his intelligence. He spoke logically, rationally, and descriptively of his computer activity, the process by which the officers identified how a Tor browser worked, the significance of the officers' presence at his home [*Id.* 37:20, 1:16:43, 1:17:30; 1:24:45], and the emotional compulsion behind his actions [*see, e.g.*, 1:30:00-1:40:00]. Mr. Cottrell told the officers "I may seem slowwitted and friendly but I'm not dumb" [*Id.* 35:10]. And he expressed, based on the presence of the officers and his confession, that he knew he was going to jail [*Id.* 1:37:20, 1:41:00-

10

1:43:00]. He explained that what he did was wrong. The totality of the circumstances, particularly the oral and written summary of his rights, support Mr. Cottrell's waiver being knowing and intelligent.

## CONCLUSION

Mr. Cottrell withdrew certain suppression issues, leaving the question of whether his waiver of constitutional rights was voluntary, knowing, and intelligent. The court answers that question in the affirmative, so denies the motion to suppress [ECF 42].

SO ORDERED.

June 11, 2021                               *s/ Damon R. Leichty*
                                            Judge, United States District Court